May it please the court. My name is Eric McGee. I represent the appellate Juan Rene Molina, a deputy sheriff from Zapata County, Texas. Deputy Molina respectfully requests that this court reverse the district court's denial of his motion for summary judgment, which was based in part on his entitlement to qualified immunity. I think it's important to note at this point in the argument that the use of force that the plaintiff has alleged occurred. I've spoken to you longer than that use of force. The video in this case, which this is a unique case where we have excessive force. It's a high speed pursuit case and we have a video. It only happened for six seconds and the video clearly shows that. First the Molina's actions were necessary for the apprehension of Mr. Salazar and that his action of using  Can the court find a fact issue on that point of whether or not he was in fact resisting or a reasonable officer would think he was resisting and also a fact issue on whether or not the taser was used multiple times after he was subdued and those are both fact questions and which make us not have jurisdiction. Can you address those points? Yes. The court did find that and that's where the court erred because in conducting that analysis of that a fact issue existed, the court did exactly what the Supreme Court has urged all courts not to do is taking into consideration hindsight 2020 and going step by step through an analysis of a freeze frame type analysis of that and then questioning the actions of Deputy Molina in this case. It wasn't a fact issue of whether it was used more than one time. The video clearly demonstrates that the use of the taser only occurred one time. Actually I thought that the testimony in the case says that if they hold down the taser that it automatically does it another time and so we don't really know for sure how many times. Do we have analysis that shows the taser was only fired once? Am I wrong on that? Right. There's two different functions for a taser. One is that when you shoot the taser and the prongs leave the taser gun it goes into that and when you hold it down it extends for five to six seconds. If you use the taser in what they call a dry stun mode then you have to press it multiple times onto the person's physical body in order for it to activate. That's not the case here. We're not talking about dry stun mode. We're talking about the use of the prongs and the taser giving the electricity current between the gun, that charge inside the gun and to the person's body. In the video it clearly shows at the six minute mark at 13 seconds Deputy Molina exits his vehicle. He begins the use of his taser at 614. At 620, so six seconds later, he is done using his taser. We don't know if he's doing multiple shots with it or if he did one because he's got it on the second way that you explained. The taser mode, right? So you can press it a bunch of times. It activates one. No, he's holding his finger down so it's continuing to tase. Right, for that first trigger of six minutes, correct. The dry stun mode requires you to actually physically be present touching the person. So you're saying if you just hold your finger down you can never be liable for that? That's too long. I don't understand your point here. Help. Okay. I think when you look at the case law and the commandments that come down from taser, there is not a case even remotely similar to our case where it has clearly been established that this type of use of force is unconstitutional. And it's not, there are cases out there. So is your point that you pivoted now to clearly establish? I thought you said there was nothing wrong. Are you saying there's nothing wrong and he didn't act, there's no fact issue on whether he held it too long? Or are you saying that there's not clearly established law? Which, are you actually saying there's nothing wrong with holding it down too long? Correct. I am saying that and I am saying clearly established. Okay. Holding it down. You could hold it down all day and it would never be, as long as you're not re-triggering it, it would never be. Is that your position? What is your position on when it becomes wrong? My position on when it becomes wrong is when there is no necessity for the use of the taser any longer. And so here, when you look at the totality of the circumstances that faced him that day, obviously using the taser, holding it down all day long, if the person has been handcuffed and... So handcuffed. It's not until they're subdued. It's until they're handcuffed. Is that correct? That's the test that you believe is the law in the circuit? It depends on the facts of all the cases involved. If the person, if there's not been a high-speed pursuit chase and the person is just standing here complying with your orders and you use a taser, the use of the taser may not have been appropriate based on those facts and circumstances. He may have been handcuffed, but his arms spread out. Okay. By taking that analysis, that's taking that 20-20 hindsight approach. This has occurred for over 6 minutes and 13 seconds, a high-speed pursuit chase. This is a blink of an eye decision, that split-second decision of Molina putting his car in park, exiting the vehicle, to unknown individuals who have barricaded themselves in, someone who has let him on a high-speed pursuit chase through a neighborhood with a lot of individuals, highly populated area. He's driven over the curb multiple times. He's run through numerous stop signs on the video. A dog has almost injured Deputy Molina because he's run out in front of it. If he would have hit it, we see someone running out of the car instantly and an unknown plainclothes person in a red pickup truck barricade he and his subject off. He knows this is an area along the border where there's drug lords and cartel that run, and so now you want to stop the video and say he's laying down face down without giving any benefit to the fact that this decision was made within one second of him parking the car. My review of the analysis of the district court is that they basically disregarded that because they freeze-framed the video, did not take the standard of looking at it in real time with all of the circumstances that had occurred. Do you want to talk about clearly established law, and can you address Kenny B. Weaver, which says that the technology is not at issue, that you can't say, well, because they didn't have a lot of taser law, that taser, that you don't have exactly a case. Now, of course, we do have the Ramirez case, which cites Kenny B. Weaver that did occur before the 2014 incident, but can you address Kenny B. Weaver? Correct. Or clearly established. I'm hoping to clearly establish because your time is dwindling, and I know we need to get to that. Thank you. So, Kenny B. Weaver, I think you have to go back to the analysis in Morrow v. Meacham, which comes up with the four commandments when looking at clearly established law, and the first one is that in framing it in a constitutional question with specificity and granularity, not to define it with the level of generality. I think when you look at— When the person is subdued, you're no longer allowed to continue to—you're not allowed to tase them if they are subdued, and you're not allowed to tase them once they are subdued already, to continue to tase them. That's the granularity. And I think that then you go to the third commandment from Morrow v. Meacham, which is overcoming qualified immunity is especially difficult in excessive use of force cases. And that third one is that one that does talk about that there is existing precedent squarely governing the specific facts at issue, which often turn on split-second decisions and blink of an eye decisions. And that's where this is. It's not that there's a case that specifically has the exact same facts of a six-second tasing. From 613 to 620 is the only time the tasing could have occurred. Counsel, can we pause right there? Yes. Because I want to make sure I understand something that came up at the very beginning of this argument. Okay. And it's a technological factual question about the two different modes that a taser can be used. So let's ignore the dry stun. I don't want to talk about that. I just want to talk about using the prongs. When you were talking to Judge Elrod at the very beginning, what I understood you to say is that if an officer deploys a taser in the prong mode, that is, he's shooting the prongs out of the gun because he's not touching the suspect at the time, that the taser can only be used for five to six seconds? That is, like, no matter how many times you pull the trigger, when it's set to that particular mode, the There's a charge that shoots it off for that amount of time. And my six-second analogy here is just based on the video itself. At that six-second mark, you see the taser fall to Officer Molina's side. He's looking around to see who these individuals are that are showing up, all the headlights directly in his thing. You can tell that he moves the wires of the taser around the body, and he moves from the left side, which has his back facing people that he does not know who they are, around to the left side, and then he holsters the taser. That taser is holstered in 19 seconds. If you look very clearly at the video, it's at the 613 mark to the 632 mark, but his hand movement is not holding it or tasing anybody at the 620 mark. So your point is that we look at the video and we can tell it was six seconds, not that the taser was technologically incapable of deploying electricity for more than six seconds? And it can, yes. I do not mean to misstate that or mislead the court in any way. I think Judge Elrod said you could hold it down, and then a charge would continue, I guess, as long as the battery life of that charge would exist. Could you please address Ramirez, since you didn't want to address Kenny V. Weaver? Can you address Ramirez directly? So Ramirez, I think the facts of Ramirez are very interesting. This is not a high-speed pursuit, Chase. Ramirez is an individual who shows up because his sister-in-law, it's a landscaping business, shows up, and the initial use of the taser was not the question. He was a noncompliant individual. They wound up having to take the person to the ground. I believe the nickname of the officer who was using this taser was nicknamed Joe Taser. And then there were lots of facts of the continuation of discussions between Mr. Ramirez and the officers, the profanity that he used back and forth, his noncompliance, and then even force that was used outside of the taser after he was even apprehended or subdued and handcuffed. And that's what that case turned on. There is no similarity between Ramirez and the facts of this case, because there is— Well, is it or not the tasing continued after he was subdued? That is the question in both cases. And here he was not subdued. This happened with— That's a factual question of whether he was subdued to begin with, even before the Well, I think if you look at Escobar, which is not a tasing case, it's a dog bite case, it's very similar facts in the sense of the person was laying on the ground. And the term subdued I don't think really fell in line there nor here. The person was laying on the ground, had thrown a weapon away from him. And in that case, this court said the dog bit Mr. Escobar. And the court in that case said, yes, he could have been a continued flight risk. There were a whole bunch of factors involved in that, similar to a lot of factors in this case. We don't know if Mr. Salazar had a weapon. He immediately bailed out of the car. We don't know if that was a ploy to pull him up. We don't know who the individual is that showed up. All of those things went into that blink of an eye, split-second decision that Officer Molina made when he parked his vehicle and used that taser for those five to six seconds. Aren't they friends of the defendant officers? You keep talking about these people. They gave each other hugs, and they're friends of the officers. That's not the individual in the red pickup truck or the other person. He was not known to Molina. He was known to other individuals there. The other officers. Who is someone who has a police scanner, trying to be in law enforcement, and showed up. That's all after the fact. When Molina showed up, all he saw was a red truck that barricaded them in with its lights flashing and an individual in plain clothing jump out of the vehicle that he didn't recognize or know. Then he sees the suspect, Mr. Salazar, my time's up, immediately bail out of the car. It was literally one second he used his taser. Thank you, Mr. McGee. You saved time for rebuttal. Mr. Nightingale. May it please the court. The most important rule of law in this case comes from Lytle v. Bear County, a 2009 decision in which this court held that force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased. So what's your closest and best case to show that there was clearly established law here at the time of this incident? Your Honor, the case that provided clearly established law to show that Sergeant Molina violated Mr. Salazar's rights comes from Newman v. Gedry in 2012 and Ramirez v. Martinez in 2013. Now, both of those cases established three rules of law that Sergeant Molina violated in two discreet ways. The first was Sergeant Molina's decision to tase Mr. Salazar in the first place after Mr. Salazar had unambiguously surrendered and no longer posed a threat. So can we talk about Ramirez on that question? Say again? Can we talk about Ramirez on that question? So how many taser cycles were involved in Ramirez? In Ramirez, I believe there were two. There were two. So what did we say about the first one? So I don't believe in Ramirez the court broke it down to that level of granularity. Well, I would point you to page 378 of the opinion where we do, and we say that the second one was the problem. And do you remember why the second one was a problem in Ramirez? Because the officer had fully subdued the subject. He was in handcuffs, laying on the ground in handcuffs. And we said you can't tase somebody when they're laying on the ground in handcuffs. But with the first taser, and we do this also in our Fourth Amendment cases involving shooting with firearms. We often will break down the constitutional analysis because, as you pointed out at the very beginning from Lytle, each use of force is its own discreet Fourth Amendment question. So if the first taser isn't a problem in Ramirez, I'm not sure how that case helped you. Because there's obviously only one use of a taser here. Yes, Your Honor. So Ramirez isn't as critical on the first tasing as it is on the second because the second tasing occurred when Sergeant Molina had fully subdued Mr. Salazar. Newman is the more critical case on the first tasing because— Was there an initial tasing in this case or at least a fact issue on it? Yes, Your Honor. And regardless of how the court feels about the initial tasing, the second tasing clearly violated clearly established law as it existed on March 1, 2014. And what's the evidence of the second tasing? I've watched this video several times and I just see the one. So I don't understand. You would agree with me that I'm supposed to watch the video under Scott v. Harris and that the findings of fact from the district court cannot overcome watching the video after Scott v. Harris? Yes, Your Honor, but the Scott v. Harris standard is a demanding one. It requires that the video so utterly discredit the plaintiff's version of the events that no reasonable jury could believe it. Now here, if we break down the video closely and we construe it in a light most favorable to Mr. Salazar, then the tasing begins at the 6-13 mark. Now there is evidence that each taser charge only lasts for five seconds and that an officer either has to continue holding the taser's trigger down or affirmatively pull the trigger a second time to trigger a second cycle. Now when you watch the video, because the taser's charge only lasts for five seconds, construed in a light most favorable to Salazar, the charge would have ended at 6-18. But Mr. Salazar continues to move and writhe around on the ground until at least the 6-20 mark. And then he briefly goes limp before flinching upwards two additional times at the 6-21 and 6-22 marks before going limp on a more permanent basis. This led two witnesses who have extensive experience with taser usage to conclude that Sergeant Molina tased Mr. Salazar multiple times. Now the jury is entitled to credit that testimony and draw its own conclusions from the video. But 6-13, did I understand you said 6-13 to 6-21 or 6-22? 6-13 until 6-22 going permanently limp at around 6-23. Yeah, so the theory is that he did two five-second charges. Correct, Your Honor. But if you look at his hand, that's not – I mean, he has the first six seconds he's holding it. You can see him holding the taser. And then after the end of the sixth second, his hand moves, and he starts moving around. And so it's just hard to understand how you get to say, well, we should infer that there were two. Because you can see the officer very clearly in the video. You can see his hand. You can see the taser. Yes, Your Honor, but the officer doesn't necessarily have to continue holding his hand out to trigger the taser a second time. He could continue holding the trigger down as he moves it to his side. He could pull it a second time as he moves it to his side. The jury is free to reach those conclusions based on the movements that Salazar made during the relevant timeframe as well as the testimony of those two witnesses. So the theory is that the first use of the taser isn't the problem. The theory is that we need to find that there was a second use of a taser, and that's what makes it look like Ramirez, even though there's no handcuffs. No, Your Honor. So the second tasing is what we might consider a failsafe. There is clearly a fact issue as to whether Sergeant Molina violated the clearly established rule against using force on a subdued subject. But what's your best case that the first taser cycle was unconstitutional? Yes, Your Honor, so now turning our attention to the initial tasing, I think it's important that we break this one down into the two components of the qualified immunity analysis. And I think the best case for us on the clearly established law prong is Newman v. Ramirez. And how many tasings were in Newman? So the key act of the officer in Newman wasn't necessarily the tasing itself. It was the officer's decision to immediately start beating the subject with a baton. And how many times – do you remember how many times he got beaten with a baton? Multiple times. Thirteen. So there were no baton beatings here. That's why I'm just having a hard time trying to figure out how to put these cases on your facts. Yes, Your Honor, I understand. The issue with – the issue in Newman was that the officer immediately resorted to intermediate force, the baton strikes, on a subject who was not resisting arrest or immediately threatening the officer. Now, as Judge Elrod pointed out in Mr. McGee's presentation, the method that the officer used isn't necessarily relevant. It's the fact that he immediately resorted to intermediate force. So using the baton strikes was inappropriate in Newman because the subject was not resisting arrest and not threatening anyone. And that is the rule that was clearly established by Newman. But you'd agree that your client was actively resisting arrest for – I mean Newman was a passenger in a car and wasn't even the one with the unpaid parking tickets, right? So obviously you don't have that defense here. Your client was actively resisting arrest and then immediately stopped. He wants to get the benefit of the Fourth Amendment from the stop, but just ignore everything that happened before? Well, no, Your Honor. He doesn't have to ignore everything that happened before. But this – so this goes back to the first problem of the qualified immunity analysis and examines whether a constitutional violation occurred. And on that issue is where the rule from Lytle v. Bexar County becomes critically important. Because even though Mr. Salazar was resisting arrest when he was initially trying to evade Sergeant Molina in his car, Mr. Salazar's surrender gave Sergeant Molina sufficient time under Lytle and also this court's more recent decision in Amador v. Vasquez to determine that any resistance had ceased and any threat had ended. But that just begs the question because, I mean, that's easy to say and perhaps in hindsight, there's no way this officer knows that there's not going to be any further resistance given that there had been a violent episode, namely a lengthy high-speed chase dangerously through a neighborhood. So this split-second decision by the officer, we can't just look later and say, well, you know, maybe he wouldn't have – I mean, maybe he would remain subdued. Yes, Your Honor. I appreciate that this was a highly volatile situation and Mr. – Sergeant Molina had to make a quick decision. But we're not looking at it from a 2020 hindsight perspective. We're still looking at it from Sergeant Molina's perspective at the time. And Lytle teaches that we have to look at it at the moment that the taser was used. And at the moment the taser was used, Sergeant – or Mr. Salazar had unambiguously surrendered in the exact manner that – or in almost the exact manner that this court described in Escobar v. Monti by dropping to his knees, putting his hands in the air, and then lying submissively on the ground. The only reason he didn't comply with any commands is that no commands were given. Because he'd been racing through the neighborhood. I mean, the thing – how long, in your view, does the Fourth Amendment – like when does the Fourth Amendment come into play such that it's an unreasonable seizure for the officer to use force? Like how long does the officer need to wait and make sure that, in fact, the suspect has surrendered before it would then become unreasonable for the officer to use intermediate force? Yes, Your Honor. So Lytle is what controls on it? Lytle says that three to ten seconds is sufficient for an officer to appreciate that a threat has subsided and that resistance has ended. Here Sergeant Molina had upwards of eight seconds to appreciate that the threat had ended. Now that doesn't necessarily mean that Sergeant Molina couldn't do anything. But what Newman teaches is that he couldn't resort immediately to intermediate force. In fact, he had to use measured and ascending responses in response to Mr. Salazar's surrender. This could have included verbal commands, negotiation, and lesser forms of physical skill, such as grabbing Mr. Salazar or attempting to handcuff him. But Sergeant Molina didn't do that. He resorted immediately to his taser. I think it's important to distinguish the Escobar case on this point, Your Honor, because it is true that in Escobar the sergeant behaved reasonably on a subject like Mr. Salazar, who had attempted to evade arrest initially and then tried to surrender. But at its core, Escobar is an immediate threat case. The court cited three specific factors that made the subject in that case an immediate threat despite his apparent surrender. The first was that the subject was explicitly suspected of a violent crime, assaulting his wife. The second and more important factor was that he had a knife within reach. So even though he had surrendered, at any moment he could have reached out, grabbed that knife, and then stabbed either the dog or the officer. And then the third factor was the warning from the subject's mother that the subject would have to be killed in order to be caught. That warning in particular gave the officer reason to believe that the surrender was false. None of those factors are present here, Your Honor. That leaves the only thing in common with Escobar is the fact that Mr. Salazar also attempted to evade arrest. But this court has made clear, going as far back as Lytle, that flight alone is insufficient to justify the use of intermediate force on a subject who has stopped resisting. Because otherwise, it would give the officers an ongoing license to use force on a subject who was otherwise unthreatening because he was threatening earlier. This is not the law. On the contrary, Mr. Salazar's actions here conform to the unambiguous surrender that this court recognized in Escobar. Analogizing this case to Cooper, Mr. Salazar's conduct was quite similar. He was not suspected of committing a violent offense, only speeding and evading arrest. Sergeant Molina was not warned that Mr. Salazar might be violent, as the officer was in Escobar. And Sergeant Molina could see Mr. Salazar's hands and knew that Mr. Salazar did not have a weapon. So all of these factors, combined with the eight-second surrender, gave Sergeant Molina more than sufficient time to conclude that Mr. Salazar was not a threat and was not resisting arrest at the key moment, the moment of the taser. But Sergeant Molina nevertheless resorted immediately to his taser. Now, to be sure, Sergeant Molina cites a number of other factors to suggest that Mr. Salazar remained a threat despite his surrender and despite these other things that I've discussed from Cooper v. Brown. And I'm happy to take any questions the court might have on those specific things that Sergeant Molina cites. So Mr. McGee relies at least partially on the assertion that the district court here used the freeze frame analysis rather than, these are my words, looking at the video in context or looking at the video as a whole. What is your response to that? Yes, Your Honor. I think that the freeze frame analysis, so to speak, is just another way of looking at the video using a moment-by-moment analysis that is dictated by Amador v. Vasquez and Lyell B. Bear County. But that freeze frame analysis really sort of bypasses the real-time analysis where things happen very quickly over split seconds or only a few seconds. And the officer obviously wasn't there with ability to freeze things but had to consider things in rapid order, which often happens in our qualified immunity cases. This case is not unusual in that respect. It's true, Your Honor, but the jury could find that Sergeant Molina saw everything that we see today on the video. A jury could find that he saw Mr. Salazar bring his vehicle to a complete stop, open the door, step out of the vehicle, drop to his knees, and then lay down on the ground. And Mr. Salazar was laying down on the ground for upwards of five seconds, I believe, before Sergeant Molina tased him. And that gave Sergeant Molina more than sufficient time under Amador and under Lytle to appreciate that the threat had passed. Yet he resorted immediately to the use of his taser. So can you help me understand? I'm still struggling a little bit with Lytle because obviously it's not a tasing case. It's a shooting case, and it obviously doesn't involve the fleeing suspect. The plaintiff is a passenger in the car who, by all accounts, was an innocent bystander. And so if the point of Lytle is to say in the three to ten seconds it took for the car to drive from a complete stop to three to four houses down the block, the officer should have known not to use a firearm, how do you get a constitutional rule that says after the suspect himself has been fleeing, as Judge Smith points out, through the neighborhood at high speeds and all this danger, et cetera, et cetera, et cetera, that intermediate force is somehow unconstitutional? You see, if one case is about deadly force and the other is about intermediate force, one is about three to ten seconds in a car rolling three to four houses down a block, and the other case is about a man who may or may not be surrendering and you only know in hindsight, it just strikes me that all the variables are different, and I don't see how you get a constitutional rule that every reasonable officer should have known don't use a taser here. Yes, Your Honor, so there are two components to that question that I can identify. The first is that the use of force was different, the type of force was different. But going back to Kenny, the type of force isn't necessarily dispositive. So it doesn't necessarily matter that the use of force in Lytle was lethal, whereas here it was intermediate in determining whether the use of force was justified. And then the second issue is what caused the subject to no longer become a threat. In Lytle it was that the subject was three to four houses down and therefore no longer a threat to the officer versus here it was an unambiguous surrender where Mr. Salazar was laying on the ground for three seconds before the taser. So the different reasoning for why the threat disappeared isn't necessarily relevant either. In your view, is there any amount of force that would have been constitutionally allowed here? Yes, Your Honor. He could have approached Mr. Salazar, grabbed him by his hands, which were splayed out on the ground, moved those hands behind his back, and then handcuffed him. That would have been an appropriate level of force under this Court's decision in Newman v. Gedry where it said that negotiation, verbal commands, and physical skill would have been appropriate to use on the subject who was arguably passively resisting, but based on the facts of that case it seemed that he was not resisting and not threatening the officer. As I recall, the resistance was a joke. Correct. It was literally a joke. He made an off-color joke. Yes, he made an off-color joke. It's hard to say that's the same as a high-speed chase, though. Yes, but Mr. Salazar's actions were similar to the plaintiff in Newman in that he was also not resisting arrest. He was not threatening anyone at the time of the tasing, or at the very least factual issues exist on that question. And for that reason, the district court was correct to deny Sergeant Molina's motion for summary judgment, and this case should go to the jury. So unless there are further questions from the Court, I will yield the remainder of my time. Thank you, Mr. Nightingale. Mr. McGee, you save some time for rebuttal. Briefly, I just wanted to address about four or five points that were raised during Mr. Nightingale's presentation. The first one is I think eight seconds is misleading. That implies that if you aren't paying attention to the video and you're looking at it, that Mr. Salazar has gotten out of his car, he's laying on the ground for eight seconds, and Mr. Molina somehow, Deputy Molina, is standing over him for eight seconds, and there's not any interaction there. Even in the change that he said later was a three to five seconds where he was laying on the ground. Again, you have to take into context that Mr. Salazar has already come to the stop. My client, Mr. Molina, Deputy Molina, is still driving and puts his car in the stop and then immediately gets out of the car, and at 2.13 is when you see him enter the frame of the camera, and at 2.14 is when you see the taser being deployed. But I wanted to bring a distinction about the three cases that he mentioned. I think you've already made my point on Lytle, so I won't go back to that one. But Newman, Ramirez, and Cooper, all of those are not high-speed pursuit cases, and all of those involve some action that occurred. Newman is a great example of where the individual was a passenger in the car. There had been interaction between the officer and Newman. It wasn't a high-speed pursuit. He made an off-color joke during a pat-down about the officer touching his genitals, and that ensued into some sort of argument, debate, profanity back and forth, and then action was taken. Same thing with Ramirez. Again, there was interaction long before any force was actually used, and then there was force used after he was already handcuffed. And the same thing with Cooper. Cooper, I think, was a dog bite case. Cooper had already been subdued and handcuffed, and the dog was still biting him, it said, for one to two minutes, according to the facts of that case, and they had not given the instruction for the dog to release and stop biting the individual who had been handcuffed in Cooper. In this case, you can look at the video starting at 6.32, 6.13, I apologize, 6.13, when Molina steps out of his vehicle, 6.14, deploys the taser, 6.20, when his hand drops to his side. Mr. Salazar is already off the ground and being escorted to a patrol car in less than one minute. This is not a situation of he continued to use force, the gentleman was handcuffed, they continued to allow him to lay on the ground and use some other force after that. This goes back to that very narrow exception that we're talking about there, of where it is the blink of an eye decision, that split-second decision, that there is no previous interaction between these two, there is no previous anything. This is you taking all the facts into consideration as you knew them, right at that particular second, and taking action on it. When you watch the video, if you don't stop it, and Judge Smith used my freeze-frame analogy, if you don't use the freeze-frame analogy, you almost miss the interaction that we're here for today, because you have to stop it and do that slow by slow, and that's not the analysis that the court even mentioned in Lidle, or in any of the recent opinions where Morrow versus Meacham has been discussed. There's a case using the taser. I understand it's before the Supreme Court. It went up on a writ of certiorari petition for certiorari, Ramirez versus Guadarramo. That, again, was a taser case of where the person had doused themselves in gasoline, and then the taser was used, and an unfortunate occurrence happened. That was just a very recent case from this court. But for all the reasons that I addressed in my initial oral argument, and then just coming back through how Newman doesn't apply, Ramirez doesn't apply, Cooper doesn't reply, Lidle doesn't apply, Deputy Molina respectfully requests that this court reverse the district court's denial of a summary judgment motion based on his entitlement to qualified immunity, render judgment in his favor due to his entitlement to qualified immunity, and that the plaintiffs in this case have not met their burden of proof once we raise that issue of qualified immunity. Thank you. Thank you, Mr. McGee. The case is under submission. The next case for today, Lopez versus Steele.